**DEAN FOODS COMPANY, Plaintiff,**

v.

**Ben BRANCEL, Secretary of the Wisconsin Department of Agriculture, Trade and Consumer Protection,† Defendant.**

No. 96–C–0875–C.

United States District Court,
W.D. Wisconsin.

Sept. 30, 1998.

---

† At the time this lawsuit was commenced, Alan T. Tracy was Secretary of the Wisconsin Department of Agriculture, Trade and Consumer Protection. Since then, Ben Brancel has become Secretary. Pursuant to Fed.R.Civ.P. 25(d)(1), he is substituted as defendant in place of his predecessor.

William M. Conley, Foley & Lardner, Madison WI, for Plaintiff.

Susan K. Ullman, Assistant Attorney General, Madison WI, for Defendant.

## OPINION AND ORDER

CRABB, District Judge.

Plaintiff Dean Foods Company, an Illinois milk processor, seeks declaratory and injunctive relief preventing defendant Ben Brancel from applying Wisconsin administrative rules regulating milk processors to purchases of Wisconsin milk that take place out of state. Suing under 42 U.S.C. § 1983, plaintiff contends that the United States Constitution's commerce clause bars defendant from trying to stop plaintiff from paying "volume premiums" to Wisconsin farmers who deliver large volumes of milk directly to plaintiff's Illinois processing plants. Plaintiff is correct. The commerce clause restricts states from applying their commercial rules extraterritorially. Plaintiff's purchases occur outside Wisconsin, beyond the state's reach. I conclude that Wisconsin courts would not interpret defendant's administrative rules to apply to plaintiff's purchases because doing so would render the rules unconstitutional. Therefore, plaintiff will be granted the relief it seeks.

This case has been the subject of many proceedings. A description of the proceedings to date is necessary to put the remaining issue into context. For some time, plaintiff has been paying a "volume premium" to dairy farmers who are able to supply large quantities of milk to plaintiff's processing plants in Illinois. About thirty of these farmers are Wisconsinites. Plaintiff pays these farmers a premium to insure a regular supply of milk and to encourage other dairy farmers to expand because, in plaintiff's view, large dairy operations are the only way dairy farmers in its milkshed can survive economically. (Because Wisconsin farms constitute a major part of plaintiff's milkshed, plaintiff has a strong interest in insuring the long term health of the Wisconsin dairy industry.)

Since 1981, Wisconsin law has prohibited processing companies from discriminating among producers in the price paid for milk "if the discrimination injures producers or injures, destroys or prevents competition between competing purchasers of milk," Wis. Stat. § 101.22(1), unless the discrimination is a good faith effort to meet competition or reflects an actual difference in the quantity of milk, in transportation charges or marketing expenses for the milk purchased. Wis. Stat. § 101.22(3). In 1996, the Wisconsin Department of Agriculture, Trade and Consumer Protection promulgated Wis.Admin.Code §§ ATCP 100.98–100.987 in an effort to put teeth into the statutes and to set out in greater detail what the law prohibits.

The new rules went into effect on October 1, 1996. Thereafter, plaintiff changed its procedures for purchasing raw milk. For milk delivered to its plants in Wisconsin, plaintiff pays no volume premiums over and above those that are cost justified in compliance with the administrative rules. It calls this plan Option 1. Under a second plan known as Option Two, plaintiff pays different and higher volume premiums for milk delivered to its plants in Illinois. Participants in the Option Two program are responsible for hiring a hauler and transporting the milk they produce to one of plaintiff's Illinois plants. Title to the milk and risk of loss are not transferred to plaintiff until the raw milk is accepted.

At the outset of this litigation, defendant raised a number of questions about the viability of plaintiff's request for declaratory and injunctive relief. If, as plaintiff maintained, its transactions with dairy farmers took place in Illinois, on what basis could plaintiff argue that it was truly facing a threat of enforcement from defendant? Defendant is well aware of the limited scope of Wisconsin's authority to regulate out of state commerce, as confirmed in cases such as *National Solid Wastes Management Ass'n v. Meyer*, 63 F.3d 652, 653 (7th Cir.1995), and *K–S Pharmacies v. American Home Products*, 962 F.2d 728, 731 (7th Cir.1992); if plaintiff was characterizing its practices accurately, it had nothing to fear because defendant had no intention of trying to regulate out-of-state transactions. If, however, plaintiff's transactions with Wisconsin farmers did not take place completely in Illinois, on what

possible ground was plaintiff contesting defendant's application of Wisconsin's rules to it?

Defendant had two other reasons for dismissal. Defendant asserted that the practices described by plaintiff were not a complete and accurate description of plaintiff's Option Two transactions with Wisconsin farmers. In his view, this suit was nothing more than a request for an advisory opinion on the applicability of Wisconsin's rules to business practices that existed only on paper. Moreover, defendant asserted that because there was no actual prosecution or threat of prosecution, plaintiff lacked standing to sue because any injury it might incur was only hypothetical or speculative. Proceeding on these grounds, defendant moved to dismiss plaintiff's complaint for lack of subject matter jurisdiction and alternatively, sought summary judgment on plaintiff's commerce clause claim.

In an opinion and order entered on December 23, 1997, I denied defendant's motion to dismiss but granted his alternative motion for summary judgment on the merits. I concluded that plaintiff could challenge Wisconsin's administrative rules without showing actual or contemplated enforcement of the rules because it faced the choice of complying with the law or suffering sanctions. *See Dean Foods Co. v. Tracy,* 990 F.Supp. 646, 652 (W.D.Wis.1997). I held also that plaintiff had alleged a sufficient injury to give it standing to sue. If the new rules were enforced against plaintiff, it would be forced to cease paying the volume premiums it wants to pay and has been paying for many years. Although I agreed with plaintiff that there was jurisdiction to entertain its claim, I found that defendant was entitled to summary judgment dismissing the case on its merits. I held that the anti-volume premium rules apply equally to in-state and out-of-state processors buying from Wisconsin dairy farmers. Therefore, the rules had to be evaluated under the balancing test first articulated in *Pike v. Bruce Church, Inc.,* 397 U.S. 137, 142, 90 S.Ct. 844, 25 L.Ed.2d 174 (1970): whether "the burden imposed on [interstate] commerce is clearly excessive in relation to the putative local benefits." Reviewing plaintiff's proposed findings of fact, I concluded that plaintiff could introduce evidence at trial showing that the volume premium rules affected interstate commerce by preventing out-of-state milk processors from obtaining whatever economic benefit is derived from paying incentive volume premiums and lowering the amount of milk revenue received by large-scale Wisconsin dairy farmers. But I concluded that plaintiff could not show at trial that the rules placed any significant burden on interstate commerce. Although plaintiff asserted that the rules had the effect of isolating Wisconsin from the national market, its evidence was lacking. Plaintiff's proposed findings of fact did not even reveal the relative sizes of the Wisconsin's milk market and the national milk market. *See Dean Foods,* 990 F.Supp. at 653–56.

Plaintiff moved for reconsideration of the order granting defendant's motion for summary judgment, arguing that it had not intended to limit its commerce clause challenge to the rules as one requiring a balancing approach, but had argued as well that the rules were an effort to regulate interstate commerce directly by restricting the amount of the premium that could be paid in a transaction occurring wholly outside the state. Also, plaintiff maintained that it had provided sufficient evidence of the rules' effect on interstate commerce to avoid summary judgment and that if it had not, the case should be reopened to give it an opportunity to supplement the record with the additional evidence that would make this showing.

Plaintiff's motion was denied. I held that plaintiff could not show that its transactions with Wisconsin farmers were wholly outside the state when the milk comes from Wisconsin cows, plaintiff does not buy milk on an as-needed basis from any supplier that happens to have raw milk (for example, plaintiff performs preliminary inspections of Wisconsin farms before accepting any supplier into its Option Two program) and the Option Two program is intended to have effects in Wisconsin (it encourages Wisconsin farmers to expand the size of their herds). I held also that plaintiff had had fair warning of what evidence it needed to prove that the rules discriminated against interstate commerce

and that it had not shown why it could not have produced its supplemental evidence to that effect when the motion for summary judgment was pending.

Plaintiff then moved for injunctive relief pending appeal that would bar defendant from enforcing the rules against it, as he had begun to do on the heels of his successful summary judgment motion. Plaintiff's arguments for granting the injunction shed more light on the nature of its contention that there was no need to employ a *Pike* balancing approach because its transactions with Wisconsin farmers were occurring in Illinois and application of Wisconsin's volume premium rules to these out of state transactions would violate the commerce clause for that reason. Given the importance of the issue and the likelihood that if it was not decided at this time, it would be back before the court in some other guise, I concluded that it made sense to reopen the case to allow plaintiff a full opportunity to develop the factual basis for its claim. That was done at an evidentiary hearing held on May 8, 1998. From the evidence adduced at that hearing and from the entire record of the case, I make the following findings of fact.

## FACTS

### A. *Background*

#### 1. *The parties*

Defendant Ben Brancel is Secretary of the Wisconsin Department of Agriculture, Trade and Consumer Protection. Plaintiff Dean Foods Company is a Delaware corporation with its principal place of business in Franklin Park, Illinois. It processes dairy products for sale under its own and other labels. Plaintiff owns and operates dairy processing plants in northern Illinois and Wisconsin.

Dean Milk Procurement Company, a subsidiary of plaintiff, is in the business of purchasing the milk that plaintiff processes but is not a party to this lawsuit. Like plaintiff, it is a Delaware corporation with its principal place of business in Franklin Park. Although Dean Milk Procurement is responsible for many aspects of the Option Two program, the legal distinction between plaintiff and Dean Milk Procurement is not material to

the outcome of this case. For the sake of simplicity, I will refer to them as a single firm.

#### 2. *The Wisconsin dairy industry*

In 1997, Wisconsin dairy farmers produced 22.4 billion pounds of milk, which amounted to roughly 15% of total United States production. Wisconsin exports most of its milk. More that half of Wisconsin's milk (69%) is drawn from herds of fewer than 100 cows. Larger farms, defined as those with more than 200 cows, account for about 8% of total state production. Annually, plaintiff processes about 1.2 billion pounds of milk at its northern Illinois plants. About 89% of this milk comes from Wisconsin farms.

To a dairy processor, a supplier with a larger herd is a more attractive source of milk than one with a smaller herd. Because of fixed costs of milk testing and farm inspection, there is a significant net cost savings if raw milk is purchased from only a few farms. In the competition to attract large-scale producers, plaintiff and other milk processors have offered "volume premiums" for at least the past decade. A volume premium is an extra payment above the base price that is calculated according to the volume of milk that the farmer delivers. A farmer with a large herd who delivers a large volume of milk gets paid more for each unit of delivered milk than a farmer with a small herd who delivers a small volume. Volume premiums can be a significant revenue source for a dairy farmer.

#### 3. *Wisconsin's volume premium rules*

Wis.Stat. § 100.22 prohibits discrimination in the "purchase" of milk. Under the administrative rules, Wis.Admin.Code §§ 100.98–987, effective October 1, 1996, the state proscribes the payment of volume premiums by milk processors unless the premiums are justified by the costs of procurement, differences in milk quality, the need to meet competition or the need to comply with a federal milk marketing order. The rules do not place a cap on the amount of volume premium; they demand only that unit prices for milk paid to the largest farmers be the same

as prices paid to the smallest farmers, after accounting for the allowable factors.

Persons subject to these rules are identified in § ATCP 100.01(9), which states in part:

"Dairy plant operator" means either of the following:

\*    \*    \*    \*    \*    \*

(a) A person who holds, or is required to hold, a dairy plant license under s. 97.20, Stats., and who buys milk from producers.

(b) A person who operates a dairy plant outside this state, and who buys milk from Wisconsin producers for delivery to that out-of-state dairy plant.

Under Wis.Stat. § 100.22(4) and (5), the department has authority to seek injunctions against milk processors that violate the rules and to impose civil penalties on violators. Also, the law permits a private party harmed by payment of unlawful premiums to pursue an action against the violator and recover double damages, costs and attorney fees. Wis.Stat. § 100.20(5).

## B. *Plaintiff's Option Two Program*

### 1. *Outline of the program*

In reaction to the promulgation of the rules, plaintiff established two milk purchasing programs that entitle some farmers to volume premiums. One of the programs, known as "Option Two," is available to farmers that deliver milk to one of plaintiff's Illinois milk processing plants in Rockford, Chemung or Franklin Park. Plaintiff has distributed circulars advertising the program throughout Wisconsin. The circular describing the Option Two program states in part:

### OPTION TWO

### MILK PURCHASED AT DEAN'S ILLINOIS FACILITIES

Applicable to raw milk delivered to, and purchased by, Dean Foods at its processing plants located in Illinois.

Producer must arrange for transportation of farm milk to a designated Dean plant in Illinois.

Producer is responsible for contracting with a hauler and payment of all transportation charges between the dairy farm and the designated Illinois plant. Title and risk of loss will not transfer until receipt of the raw milk at the Dean's plant.

Like other processors, plaintiff offers Option Two volume premiums to attract dairy farmers who can deliver large quantities of milk, but it has other reasons for the program. There has been a decline in the number of dairy farms within the Midwest milkshed from which plaintiff obtains raw milk. Plaintiff believes that its Option Two program will encourage dairy farmers in its milkshed to remain in business and possibly to expand. Separately, plaintiff is cultivating business relationships with larger farmers in its milkshed to respond to the market power of the Central Milk Producers Cooperative, one of plaintiff's historical sources for raw milk.

According to defendant, insofar as plaintiff pays Option Two premiums purely for incentive reasons, the premiums are bad for the dairy industry. First, such premiums send a signal to farmers that they should expand, although it is not true that larger farms are more efficient at producing milk than smaller farms. Second, although it may be cheaper for both large and small milk processors to buy from only a few farms, small processors do not have the resources to pay volume premiums. Therefore, in the long run, allowing payment of volume premiums may decrease the number of milk processors, reducing competition among them.

### 2. *Plaintiff's program in practice*

According to its terms, the Option Two program is available to any farmer that can haul milk to one of plaintiff's three Illinois plants. For practical reasons, only farmers within a reasonable driving distance can take advantage of the program. They cannot simply appear at one of plaintiffs Illinois plants with a large load of milk and expect a volume premium. Farmers must indicate their interest to plaintiff, who then sends one of its Wisconsin field representatives to inspect the prospective participant's farm. If the farm meets plaintiff's quality standards, the representative will designate one of plaintiffs three

Illinois plants for milk delivery and will send a milk sample from the farm to its processing plant in Sheboygan, Wisconsin for testing.

Currently, thirty-four farmers are receiving premiums under the Option Two program; thirty of these are located in Wisconsin. For them, Option Two transactions work in one of two ways. About twenty of the Wisconsin farmers have arranged to have haulers make a series of pickups at their farms. At each farm, the hauler takes a "stick reading" of the amount of milk and a sample of the milk that is later tested for quality by plaintiff. Once all milk is collected, the hauler takes the commingled load across the border into Illinois. At the plant, plaintiff confirms the weight of the load and tests the samples. The other Wisconsin farmers in the program have the haulers take their milk directly from their farms to plaintiffs plants where the single load is weighed and tested. In both scenarios, title is transferred to plaintiff at the plant after the milk is accepted. A farmer in the Option Two program is not obligated to deliver milk to plaintiff. Equally, plaintiff is not obligated to accept the milk. As a result, the risk of loss from spoilage or hazard during transport remains with the farmer until acceptance.

Payment for Option Two milk does not always go directly from plaintiff to the farmer: the farmer may assign a portion of his or her receipts to a creditor such as the hauler, a bank, a seed dealer or a farm equipment dealer. Also, to facilitate record keeping by Option Two farmers, plaintiff provides them with blank forms that are completed by the hauler and maintained at the farm. In addition, various Wisconsin statutes and administrative rules require that milk processors pay licensing and other fees for milk purchased from Wisconsin farms, conduct tests on the milk they purchase, and file informational reports with the department. *See* Wis.Stat. § 97.22; Wis.Admin.Code §§ ATCP 60.18–20; 100.06, 100.20, 100.55. Although plaintiff maintains that it is not required to comply with these requirements for Option Two purchases, it has paid the fees and filed the reports.

Logistics of Option Two transactions differ from typical industry practice. Usually, the milk processor arranges for transfer of the milk from the farm to the plant and accepts title and risk of loss when the milk is collected at the farm. Indeed, plaintiff has an "Option One" volume premium program in Wisconsin that works in this manner. Plaintiff takes title to the milk at the farm, hauls the milk to transfer stations it leases at Janesville and Shullsburg, Wisconsin, and distributes the milk to its processing plants located in Wisconsin and Illinois. (For the purposes of this proceeding, plaintiff and defendant agree that Option One is in compliance with the Wisconsin rules.) In some instances, a dairy farmer will make a long term supply contract with the milk processor, obligating the farmer to deliver milk to the processor for a stated period of time. Finally, there is a spot market for milk. A short term interruption in the supply of raw milk, or a short term increase in demand for dairy products might require a dairy processor to make ad hoc raw milk purchases from other plants or from dairy farms with which it does not usually do business. The price of raw milk on the spot market is higher for milk that obtained from a milk processor's usual sources.

## OPINION

### A. *Introduction*

Plaintiff wants Wisconsin's administrative rules declared unconstitutional if they are applied to its Option Two program. Before that can happen, plaintiff must show 1) that the Wisconsin state courts would read the rules as applying to transactions under plaintiff's Option Two program and 2) that such an application would be unconstitutional. *See Morley–Murphy Co. v. Zenith Electronics Corp.*, 142 F.3d 373, 378 (7th Cir.1998) (in deciding constitutional challenge to state statute, federal court should begin by deciding whether state courts would interpret it such a way as to raise questions of constitutionality; "[o]nly if answer is yes [is it necessary] to reach the constitutional question").

## B. *Commerce Clause Principles*

The commerce clause, art. I, § 8, cl. 3, of the United States Constitution gives Congress the power to regulate commerce among the states. The courts have read the commerce clause as an exclusive grant of power to Congress that prohibits the states "from taking certain actions respecting interstate commerce even absent congressional action." *CTS Corp. v. Dynamics Corp. of America,* 481 U.S. 69, 87, 107 S.Ct. 1637, 95 L.Ed.2d 67 (1987). Since Congressional authority in matters of interstate commerce is exclusive, judicial restriction on state action in this arena involves enforcement of the "dormant" or "negative" component of the commerce clause. *See id.* The dormant commerce clause is enforced to prevent the states from engaging in "economic protectionism," a concept the Supreme Court has defined as enacting rules to benefit in-state economic interests by burdening out-of-state competitors. *See West Lynn Creamery, Inc. v. Healy,* 512 U.S. 186, 192, 114 S.Ct. 2205, 129 L.Ed.2d 157 (1994).

■ The principal "action" that the dormant commerce clause prohibits states from taking is enacting laws that discriminate against interstate commerce. *See CTS Corp.,* 481 U.S. at 87, 107 S.Ct. 1637; *see also National Paint & Coatings v. City of Chicago,* 45 F.3d 1124, 1130 (7th Cir.1995) (Supreme Court looks for discrimination when faced with a dormant commerce clause claim); Donald H. Regan, *The Supreme Court and State Protectionism: Making Sense of the Dormant Commerce Clause,* 84 Mich.Law Rev. 1091, 1092 (1986) (cited in *CTS Corp.,* 481 U.S. at 87, 107 S.Ct. 1637) (in "movement-of-goods" cases, Supreme "Court has been concerned exclusively with preventing states from engaging in purposeful economic protectionism."). This aspect of the dormant commerce clause is no longer an active issue in this case because plaintiff never introduced the kind of evidence necessary to prove that Wisconsin's volume premium rules discriminate against interstate commerce.

■ The Supreme Court interprets the dormant commerce clause as having another purpose in addition to preventing discrimination in the movement of goods across state lines. This purpose is jurisdictional in character: states are prohibited from regulating conduct outside their territory. A state may not regulate "commerce that takes place wholly outside of the State's borders." *See Healy v. The Beer Institute,* 491 U.S. 324, 336, 109 S.Ct. 2491, 105 L.Ed.2d 275 (1989); *In re Brand Name Prescription Drugs,* 123 F.3d 599, 613 (7th Cir.1997) ("A state cannot regulate sales that take place wholly outside it."), *cert. denied,* — U.S. ——, 118 S.Ct. 1336, 140 L.Ed.2d 498 (1998); *see also Morley–Murphy Co.* 142 F.3d at 378–79 (presumption is that state laws apply only within territorial jurisdiction of state, just as federal law applies presumptively only within territorial jurisdiction of United States). Although this aspect of the clause prohibits states from enforcing rules that would subject participants in interstate commerce to inconsistent rules, *see CTS Corp.,* 481 U.S. at 88, 107 S.Ct. 1637; *Morley–Murphy Co.,* 142 F.3d at 378–79 ("Among other things, the Commerce Clause invalidates state statutes that 'may adversely affect interstate commerce by subjecting activities to inconsistent rules.'") (quoting *CTS Corp.,* 481 U.S. at 88, 107 S.Ct. 1637), it is not limited to rules that have this effect. With few exceptions, states have no authority to regulate commercial conduct outside their borders under our federal system of government. For example, a state cannot control the prices its residents charge out-of-state buyers. *See Lemke v. Farmers' Grain Co.,* 258 U.S. 50, 42 S.Ct. 244, 66 L.Ed. 458 (1922) (North Dakota could not regulate prices and profits of sales of grain shipped from state to other states for sale when essentially all grain produced in state went to other states; law clearly encroached upon field of interstate commerce); *K–S Pharmacies, Inc. v. American Home Products Corp.* 962 F.2d 728, 730 (7th Cir.1992) (proper for federal court to read Wisconsin statute as not applying state's pricing scheme to out-of-state sales; Wisconsin courts would not read statute as applying outside its borders any more than federal courts would interpret domestic legislation as applying to foreign countries).

### C. *Commerce Clause Analysis*

In the parlance of commerce clause jurisprudence, the issue is whether defendant is prohibited from applying Wisconsin's volume premium rules to plaintiff's Option Two transactions because, as plaintiff contends, the transactions are "commerce wholly outside the state." According to the parties, the only matter that I must resolve is how Option Two transactions should be characterized. Defendant concedes that if Option Two transactions are commerce wholly outside the state, he may not regulate them.

Plaintiff contends that a narrow view of the commercial indicia of Option Two transactions establish that they take place outside Wisconsin, at its three Illinois plants: Wisconsin farmers participating in that program retain title and bear the risk of loss until the hauler delivers a shipment of milk to one of plaintiff's Illinois plants. Although plaintiff offers to buy milk from larger Wisconsin farmers, the offer remains merely an offer until the hauler gets the milk to the plant; delivery seals each deal. Wisconsin farmers who participate in Option Two have no contractual obligation to plaintiff: on any given day they may ship their milk to another processor. (Plaintiff has admitted it has no recourse against a Wisconsin farmer who fails to deliver a given shipment.)

Defendant contends that the court must look at much more evidence. It must consider the overall relationship between the Wisconsin farmers and plaintiff. He points to the number of *contacts* that plaintiff has with the state of Wisconsin. Among these are the following: plaintiff solicited business for its Option Two program by mailing an announcement to Wisconsin milk producers; plaintiff employs field representatives who work in Wisconsin; plaintiff's representatives inspect the farms of all prospective Option Two participants; and plaintiff sends checks from Illinois to producers, haulers and other assignees in Wisconsin for purchases made under the Option Two program. Moreover, defendant points out that plaintiff would not be able to do business without a stable, guaranteed milk supply, and that the purpose of the Option Two program is to foster such a supply. In sum, defendant argues that plain-

tiffs extensive contacts with Wisconsin and purpose for developing the Option Two program bely the contention that the Option Two program entails a series of contracts. Rather, plaintiff is actually entering into long-term contracts, with multiple instances of performance, that span the border.

The parties do not address the matter, but before it can be determined whether Option Two transactions are commerce occurring outside the state, the phrase "commerce occurring wholly outside the state" must be defined. Without a definition, I cannot say what evidence is relevant or gauge the merits of the parties' arguments. Unfortunately, research reveals no case law defining the standard although three cases give oblique guidance.

1. In *Morley–Murphy Co.*, 142 F.3d at 373, the issue was whether the commerce clause barred extension of Wisconsin's Fair Dealership Act, Wis.Stat. §§ 135.01–.07, to dealerships that a Wisconsin-based dealer, Morley–Murphy, owned and operated in adjoining states. The court of appeals gave no weight to the extensive ties between Morley–Murphy and its out-of-state dealerships, focusing instead on the sales at those dealerships. The court held that the Wisconsin courts would not read the act as affecting dealerships that Morley–Murphy owned in adjoining states and that it was improper for the jury to have taken into consideration lost sales from those dealerships when computing the damages to which Morley–Murphy might be entitled to because of the actions of a manufacturer, Zenith Electronics. *Id.* at 380. The court was concerned that reading the act to apply to the Morley–Murphy's dealerships in other states would violate the principle that a state cannot enact a law imposing inconsistent obligations on persons participating in interstate activities. *See id.* at 379. This concern remained even if the sister state has chosen not to impose any rules upon the dealer-grantor relationship so that there are no conflicting obligations placed upon the parties to the contract. The result would still be that Wisconsin's choice of policy overrides that of the other state. *Id.*

2. In *Aldens, Inc. v. La Follette*, 552 F.2d 745 (7th Cir.1977), the issue was whether Wisconsin could apply its consumer protection act to an out-of-state mail order company, Aldens, that did business with Wisconsin residents; in particular, whether Wisconsin could regulate the company's revolving charge account plan. The court of appeals determined that Wisconsin law could be applied to accounts that Aldens had set up with Wisconsin residents. For consumer credit purposes, the location of the credit transaction was Wisconsin because Aldens mailed the credit applications to the Wisconsin purchasers and the applications were completed within the state. *See id.* at 748. The court reasoned that regulation of the credit agreements was a legitimate exercise of Wisconsin's police power in protecting residents from "oppressive credit terms." *See id.* at 750. The court of appeals paid no attention to the fact that Chicago was where purchase orders were sent, merchandise was put into the mail, payments were collected and employees and offices were located. *See id.* at 748. Essentially, the Illinois contacts were irrelevant in deciding whether Wisconsin could regulate a credit agreement that a Wisconsin resident signed inside the state's borders.

3. *Edgar v. MITE Corp.*, 457 U.S. 624, 642–643, 102 S.Ct. 2629, 73 L.Ed.2d 269 (1982), involved an Illinois statute requiring that corporate takeover offers be registered with the Illinois secretary of state. The statute authorized the secretary to conduct hearings concerning the offer and to deny registration to offers that did not disclose adequate facts. Target corporations for which offers had to be filed included companies with ten percent of more Illinois shareholders or that met two of these criteria: organized under Illinois law, principal place of business in Illinois or having a certain portion of assets located in Illinois. *See id.* at 627, 102 S.Ct. 2629. In concluding that the statute violated the commerce clause, a plurality of the Court found that the Illinois statute regulated commerce occurring wholly outside Illinois. *See id.* at 643, 102 S.Ct. 2629. The Illinois statute could be applied to takeovers involving corporations whose shareholders all resided in states other than Illinois. Thus, Illinois could regulate a transaction that did "not affect a single Illinois shareholder." *See id.* at 642, 102 S.Ct. 2629. The plurality explained further that such extraterritorial application of the statute doomed it for commerce clause purposes, "whether or not the commerce has effects within the state." *See id.* at 642–63, 102 S.Ct. 2629; *see also Healy v. The Beer Institute*, 491 U.S. 324, 336, 109 S.Ct. 2491, 105 L.Ed.2d 275 (1989) (majority opinion).

These cases provide two important clues to the meaning of commerce occurring wholly outside the state. First, it is *transaction* or *sale* oriented. In *Morley–Murphy Co.*, 142 F.3d at 373, the court of appeals found that the contacts between a Wisconsin firm and outlets that the firm established in neighboring states were not relevant when determining whether the Wisconsin firm was entitled to damages for violation of a Wisconsin law; sales from non-Wisconsin outlets had to be ignored. *See id.* at 380. In *Aldens*, 552 F.2d at 745, the court of appeals concluded that Wisconsin *could* regulate a consumer credit transaction because the credit agreement was signed in Wisconsin. In reaching this conclusion, the court ignored evidence that the out-of-state firm conducted most of its business in Illinois. *See id.* at 748, 750; *see also In re Brand Name Prescription Drugs*, 123 F.3d at 613 (7th Cir.1997) ("A state cannot regulate *sales* that take place wholly outside it.") (Emphasis added).

The second clue these cases provide is that commerce occurring wholly outside the state is *location* oriented. *Edgar*, 457 U.S. at 642–643, 102 S.Ct. 2629, teaches that regardless of the effects an out-of-state transaction or sale has on economic activity inside a state, the commerce clause bars the affected state from regulating the transaction; Illinois could not enact a law designed to curb hostile takeovers if it meant regulating the transfer of shares between persons outside Illinois. That state borders have this effect is a well accepted proposition. Consider the borders in this judicial circuit. Illinois residents cross the Wisconsin border to buy Powerball tickets and the Indiana border to buy gas. When Wisconsin protected its butter industry by barring sales of colored margarine

Wisconsin residents traveled to Illinois stores to buy yellow margarine. Certainly, these cross-border activities have negative effects on the *intrastate* economies in this circuit, but that is the necessary cost of preserving one economic union.

### D. *Application*

█ In light of the proscription against a state's regulation of commerce occurring wholly outside the state and the historical focus on sales and transactions and the location of such sales and transactions, I am persuaded that the Wisconsin courts would not read the state's volume premium rules to apply to milk processors who pay volume premiums for milk bought in Illinois that originated from a Wisconsin cow. The enabling statute, § 100–22, provides in pertinent part:

> **Discrimination in *purchase* of milk prohibited**
>
> (1) PROHIBITION. Except as provided in sub. (1m), no person engaged in the business of *buying* milk from producers for the purpose of manufacture, processing or resale may discriminate between producers in the price *paid* for milk. . . .

Wis.Stat. § 100.22 (Italics added). Plaintiff's argument is that the statute and rules apply to sales and therefore the transfer of title and risk of loss should control the determination of where Option Two transactions purchases. Because these two events occur in Illinois, Wisconsin is without authority to regulate Option Two purchases. Defendant's argument is that plaintiff's extensive contacts with Wisconsin and the purposes of its Option Two Program (to make Wisconsin dairy farms bigger) must be considered and that when they are considered, it becomes clear that Option Two transactions do not occur in Illinois.

I believe that the Wisconsin courts would look to the transfer of title and risk of loss and reject defendant's invitation to look at contacts and effects. Construing the statute to look at these facts and not the location where the parties transfer title and risk of loss would create serious commerce clause concerns. To avoid this result, the Wisconsin courts would hold that the enabling statute applies only to sales of milk that occur in

Wisconsin and they would define "sale" according to the transfer of title and risk. Guided by *Aldens* and *Edgar*, Wisconsin courts would be hesitant to accept defendant's offer to examine all of plaintiff's contacts with Wisconsin and the effects that the Option Two Program is intended to have on Wisconsin's dairy industry.

There is an additional reason why the Wisconsin courts would hesitate to adopt defendant's contacts and effects theory: basing § 100.22 on contacts and effects would present a problem of statutory construction, given the statute's use of the terms "purchase," "buying" and "paid." It is true that a rule promulgated under § 100.22 provides some clarification. Section § ATCP 100.01(9)(b) says that "a person who operates a dairy plant outside this state, and who buys milk from Wisconsin producers for delivery to that out-of-state dairy plant" is subject to the volume premium rules. Although the language of this regulation might allow for consideration of plaintiff's contacts with Wisconsin, a Wisconsin court would not apply the rule to plaintiff's Option Two purchases of milk because the commerce clause concerns would still be present.

### E. *Possible Discrimination?*

Before concluding, it is necessary to address one last substantive concern with Wisconsin's volume premium rules. Previously, I explained that the possibility that the rules discriminate against interstate commerce was no longer an issue in this case because plaintiff had failed to introduce evidence necessary to establish discrimination. This observation must be qualified. Although plaintiff has failed to present such evidence, there is evidence of discrimination in the record.

Evidence adduced by *defendant* subsequent to summary judgment reveals that the volume premium rules have the practical effect of discriminating against interstate commerce by protecting Wisconsin milk processors who do not have the resources to offer volume premiums. From the beginning of this litigation, plaintiff has argued that the rules were subject to aggressive judicial scrutiny because the rules "protect in-state processors" from out-of-state milk pro-

cessors, such as plaintiff, that have the resources to pay volume premiums. *See* Pl.'s Br. in Supp. of its Mot. for Summ.J., dkt. # 21, at 11. At summary judgment, plaintiff was hoping to show that the Wisconsin rules were a classic example of state protectionism of local industry. In support, plaintiff relied on *Baldwin v. G.A.F. Seelig, Inc.,* 294 U.S. 511, 55 S.Ct. 497, 79 L.Ed. 1032 (1935), which involved a challenge to a New York regulatory scheme that set minimum prices for raw milk and banned the sale of imported milk that had been purchased at lower prices. The challenge was brought by a milk processor that acquired milk in Vermont at a price below the New York minimum price and imported the cheaper Vermont milk into New York for sale to businesses and consumers. New York's Commissioner of Farms and Markets refused to license Seelig to transact business in the state unless it agreed to pay the Vermont suppliers the higher New York price. *See id.* at 518–20, 55 S.Ct. 497. The Supreme Court held that New York could not bar the import of the cheaper Vermont milk. It recognized that New York's regulation served to "promote the economic welfare or her farmers" by "guard[ing] them against competition with the cheaper prices of Vermont." *See id.* at 522, 55 S.Ct. 497.

Although plaintiff raised this point in briefing the motion for summary judgment, it did not put into the record adequate evidence to bolster its theory of the practical effects of the Wisconsin volume premium rules. Unlike the New York laws at issue in *Baldwin,* the purpose and effects of Wisconsin's volume premium rules are not apparent from their neutral wording. Now, however, defendant has supplied the evidence. (It was not an accident. The evidence was introduced in rebuttal to plaintiff's contention that injunctive relief pending appeal would not harm the public interest).

One reason the Wisconsin rules prohibit volume premiums that are not linked to costs savings associated with larger farms, such as plaintiff's Option Two premiums, is that not all milk processors have the resources to pay that level of premiums. Defendant admits in its last brief that the rules "were enacted in the interest of Wisconsin producers and dairy plant operators purchasing milk from Wisconsin producers." Def.'s Pretrial Br., dkt. # 77, at 3. Further, defendant cites the department's analysis of the rules, in which the department explains in more detail how the rules prevent payment of premiums that may injure "competing dairy plant operators" and "contribute to unwarranted concentration in the dairy industry." *Id.* This admission by defendant is evidence that Wisconsin promulgated its rules with the intent of protecting smaller, Wisconsin milk processors from larger milk processors inside and outside Wisconsin that have greater financial resources.

Wisconsin has the authority to pursue such goals so far as the rules it promulgates apply only to *intra* state commerce. *See Morley–Murphy Co.,* 142 F.3d at 379 ("It is obviously up to Wisconsin to decide whether it wants a franchise protection law that (at least potentially) imposes additional costs on companies that wish to serve the Wisconsin market...."). However, defendant concedes, and I have found, that Wisconsin's volume premium rules affect interstate commerce. *See Dean,* 990 F.Supp. at 655. This fact, coupled with the admission that the rules are designed to protect Wisconsin dairy processors that cannot afford volume premiums, is fatal to the state's effort to defend the rules against a commerce clause challenge brought by plaintiff, a large out-of-state milk processor. Just as in *Baldwin,* 294 U.S. 511, 55 S.Ct. 497, 79 L.Ed. 1032, in which the Supreme Court held that New York could not protect its dairy farmers by stopping imports of cheaper Vermont milk, Wisconsin cannot protect its milk processors from their wealthier Illinois, Minnesota or Iowa competitors by trying to regulate the prices paid for milk sold outside the state. Wisconsin's rules appear as protectionist as New York's law. Thus, Wisconsin's volume premium rules might be unconstitutional, just like New York's. *See id.* at 522, 55 S.Ct. 497 ("If New York, in order to promote the economic welfare of her farmers, may guard them against competition with the cheaper prices of Vermont, the door has been opened to rivalries and reprisals that were meant to be

averted by subjecting commerce between the states to the power of the nation.").

However, because I have found that plaintiff would be able to show that the Wisconsin courts would not apply the volume premium rules to its Option Two purchases of raw milk from Wisconsin farmers, there is no need to express a view whether these possible discriminatory effects render the rules unconstitutional.

### F. *Summary*

I conclude that a Wisconsin court would not interpret Wis.Stat. § 100.22 or Wis.Admin.Code §§ ATCP 100.98–987 as applying to plaintiff's Option Two program. The parties agree that the commerce clause does not allow a state to regulate commerce outside its borders. Moreover, the commerce clause jurisprudence places great weight on sales and transactions and the location of sales and transactions when determining whether a state law violates the commerce clause. In light of these considerations, the Wisconsin courts would agree with plaintiff that because it does not take title to the milk or accept risk of loss in an Option Two purchase until the milk reaches one of its Illinois plants, the state of Wisconsin may not regulate plaintiff's Option Two transactions. The Wisconsin courts would choose plaintiff's view of the transaction so at to avoid the serious constitutional question that would follow if the location of the sale were set aside in favor of a broad inquiry into plaintiff's contacts with Wisconsin and the effects that Option Two transactions have on the state's economy. *See State ex rel. Harvey v. Morgan*, 30 Wis.2d 1, 13, 139 N.W.2d 585 (1966) (Wisconsin courts have duty to construe statutes in harmony with accepted constitutional principles).

The effect of this determination is that plaintiff's Rule 59 motion for reconsideration of the decision to award summary judgment in favor of defendant must be granted. Plaintiff is correct that the volume premium rules would be unconstitutional if applied to its Option Two purchases of milk from Wisconsin farmers because the rules would be directly regulating commerce occurring wholly outside the state, in Illinois. Not only does this conclusion require granting plain-

tiff's motion for reconsideration, it entitles plaintiff to the injunctive relief it seeks against application of the Wisconsin rules to its Option Two transactions and entry of judgment to that effect. *See Mason v. Melendez*, 525 F.Supp. 270, 287 (W.D.Wis.1981) (on summary judgment, judgment may be entered in favor of the non-moving party if facts and law reveal that non-moving party is entitled to judgment). Judgment will be entered in favor of plaintiff prohibiting defendant from prosecuting plaintiff for purchases of milk made from Wisconsin milk producers under the Option Two program, provided that transfer of title to the milk takes place outside the state of Wisconsin so that the producer bears all risk of loss up to transfer of title.

Because plaintiff is entitled to the injunctive relief it seeks, there is no need to determine expressly whether the rules are void in their entirety because they discriminate against interstate commerce. Also, there is no need to consider plaintiff's alternative motion for injunctive relief pending appeal. The motion is moot.