**DEAN FOODS COMPANY,**
**Plaintiff–Appellee,**

v.

**Ben BRANCEL, Secretary of the Wisconsin Dept. of Agriculture, Trade and Consumer Protection, Defendant–Appellant.**

No. 98–3797.

United States Court of Appeals,
Seventh Circuit.

Argued May 21, 1999.

Decided Aug. 3, 1999.

William M. Conley (argued), Foley & Lardner, Madison, WI, for Plaintiff–Appellee.

James E. Doyle, Susan K. Ullman (argued), Office of the Attorney General, Wisconsin Department of Justice, Madison, WI, for Defendant–Appellant.

Before FLAUM, KANNE and ROVNER, Circuit Judges.

FLAUM, Circuit Judge.

Dean Foods Company ("Dean Foods") sued the defendant Ben Brancel ("the Secretary") in his official capacity to prevent him from enforcing Wisconsin milk-pricing regulations against transactions Dean Foods claimed took place in Illinois. After extensive fact-finding, the district court judge granted the plaintiff's motion for injunctive relief, holding that because

these transactions took place outside Wis-. consin (and in Illinois), the Wisconsin regulations could not be enforced because of the Constitutional ban on extraterritorial legislation. The district court additionally suggested that the regulations likely violate the dormant Commerce Clause's restriction on statutes discriminating against interstate commerce, although it refrained from actually declaring them unconstitutional. For the reasons set out below, we reach only the extraterritoriality grounds, and affirm the district court's ruling on that basis.

### Facts

Dean Foods is an Illinois milk processor which purchases raw milk from Wisconsin dairy producers for processing at its three northern Illinois plants. It buys approximately 1.07 billion pounds of milk, equaling 89% of its yearly purchases, from Wisconsin farmers. For efficiency reasons, the appellee prefers to purchase from milk producers with large herds, rather than those with fewer cows. To encourage producers to maintain larger herds, Dean Foods pays "volume premiums" to those producers supplying it with greater quantities of milk. Dean Foods is not alone in paying these premiums; generally, processors that can afford volume premiums pay them. A volume premium is a payment over and above the base price for milk, and is calculated based on the amount of milk delivered by the farmer to whom the premium is paid. For volume premium purposes, the bigger the delivery, the larger the payout. The premium is based solely on the amount of milk a producer sells to Dean Foods, and is unrelated to product quality.

The processing industry's preference for larger herds, and the incentives processors pay to encourage bigger herds, appear to have exacted a cost: the record indicates that Wisconsin has lost roughly 15,000 dairy farms in the past fifteen years. To stem this tide, the Secretary has promulgated regulations which prohibit the payment of volume premiums. *See* Wis. Admin. Code ATCP §§ 100.98–100.987 (1996) (also referred to as the "rules" or the "regulations"). Another apparent reason for the ban on these premiums is that smaller in-state processors are less likely to be able to pay them, thus threatening their future viability. Fewer processors, according to the appellant, would reduce competition among processors and harm consumers. These rules were enacted pursuant to a Wisconsin statute first passed in 1981, which states that "no person engaged in the business of buying milk from producers ... may discriminate between producers in the price paid for milk ... if the discrimination injures producers," Wis. Stat. § 100.22(1), but which was apparently not enforced against volume premiums prior to the enactment of the 1996 regulations. The rules prohibit dairy processors from paying "unjustified" volume premiums to dairy farmers. Premiums are only justified by: (1) differences in the cost of procurement of the milk; (2) differences in the milk quality; (3) the need to meet competition; and (4) the need to comply with a federal milk marketing order. *See* Wis. Admin. Code ATCP §§ 100.982–100.984. Under the statute, the Secretary can seek injunctions against processors who violate the regulations, and can also impose civil penalties against them. Wis. Stat. § 100.22(4)-(5). A full complement of remedies to injured private parties is also available, including double damages. *Id.* at § 100.20(5).

The strengthened volume premium rules went into effect on October 1, 1996. Prior to that date, Dean Foods had only one method of obtaining raw milk from Wisconsin dairy farmers. It would hire milk haulers to collect and transport milk from farms, mostly in Janesville and Schullsburg, to its plants in northern Illinois. Under this arrangement, still in existence, Dean Foods took title to the raw milk and assumed the risk of loss as soon as its hauler picked it up in Wisconsin. The appellee owned the milk as soon as the

hauler received it. Haulers sometimes commingled milk from different farms, and if the entire load became contaminated, Dean Foods would pay the farmers who sold it the non-spoiled milk.

Effective October 1, 1996, Dean Foods announced a new milk-purchasing program intended to circumvent Wisconsin's volume premium ban. Under its new program called "Option Two" (the old purchasing program is now referred to as "Option One"[1]), the appellee does not accept the risk of loss until the raw milk is accepted at its Illinois plants. At Option Two's inception, Dean Foods told farmers that if they wished to sign up under the plan, the farmers would be responsible for contracting with haulers to transport the milk to its Illinois plants. Option Two participants also must pay the haulers for their services, and the program's guidelines stipulate that Dean Foods has no obligation to accept shipments of milk. If rejected for any reason, the milk remains the farmer's property.

The appellee assumed that because the sale of milk under Option Two occurred in Illinois, Wisconsin law banning payment of volume premiums would be inapplicable. Thus, while Option One participants may not receive volume premiums, farmers enrolled in the Option Two plan may. At the time of the district court's final decision, thirty-four farmers participated in the Option Two plan, including thirty from Wisconsin. Of these, twenty arranged to have haulers pick up their milk together and commingle their product. The other ten delivered their milk to Dean Foods' processing plants individually.

Dean Foods instituted a declaratory judgment action in federal district court against the Secretary in 1997, claiming that the volume premium rules violated the dormant Commerce Clause of the Constitution. The Secretary argued, among other things, that the plaintiff failed to meet Article III and prudential standing and injury-in-fact requirements because no administrative action against the appellee was impending. The district court rejected these arguments, but granted the defendant's motion for summary judgment on the grounds that the plaintiff could not prove that the regulations placed a significant burden on interstate commerce. See Dean Foods Co. v. Tracy, 990 F.Supp. 646, 649–56 (W.D.Wis.1997).

The plaintiff's first motion for reconsideration was denied by the district court. However, on a second motion for reconsideration, the district court judge reversed herself, and granted the plaintiff's motion for injunctive relief. See Dean Foods Co. v. Brancel, 22 F.Supp.2d 931 (W.D.Wis. 1998). By this time, the Article III concerns were mooted because the Secretary formally commenced an action in Wisconsin state court to enforce its regulations against the appellee's Option Two program.[2] After examining the evidence, the district judge found that Option Two milk sales took place in Illinois, and therefore occurred wholly outside Wisconsin. Accordingly, she found that Wisconsin courts would not enforce an administrative action by the Secretary against Dean Foods for using Option Two to evade the ban on volume premiums. Thus, Judge Crabb issued an injunction barring the Secretary from enforcing the volume premium regulations against Option Two sales occurring wholly outside Wisconsin. The district court also found the Secretary's rules problematic because they "have the practical effect of discriminating against interstate commerce by protecting Wisconsin milk processors who do not have the resources to pay" volume premiums. Dean Foods Co. v. Brancel, 22 F.Supp.2d at 941.

1. For the purposes of these proceedings the parties have assumed that the Option One program complies with Wisconsin's statutes and administrative rules.

2. After the district court's final ruling, the state court dismissed the enforcement action without prejudice upon the Secretary's motion.

The Secretary now appeals the district court's order granting injunctive relief to the plaintiff.

## Analysis

Below, we address the three central issues the parties have raised. First, we analyze the Eleventh Amendment sovereign immunity defense Wisconsin offers. Second, we examine the scope of the constitutional ban on extraterritorial regulation, keeping in mind both sides' agreement that Wisconsin may not regulate commerce which occurs "wholly outside its borders." Third, we apply principles of contract law to determine where the Option Two "commerce" took place.

### A.

The district court here adopted the somewhat unusual posture of putting itself in the position of a Wisconsin court because an enforcement action of the volume premium rules by the Secretary would normally occur in state court. The appellant claims that the ruling that a Wisconsin court would not apply the volume premium rules against Option Two because those sales occur outside of Wisconsin (referred to as "extraterritoriality" or "the extraterritoriality principle") violates the Eleventh Amendment of the United States Constitution.

■ The Eleventh Amendment is a jurisdictional bar to certain kinds of suits in federal court against a state by its own citizens or citizens of another state. *See Hans v. Louisiana*, 134 U.S. 1, 18, 10 S.Ct. 504, 33 L.Ed. 842 (1890). Of course, not all suits against states violate the constitution. *See, e.g., College Savings Bank v. Florida Prepaid Postsecondary Educ. Exp. Bd.*, —— U.S. ——, 119 S.Ct. 2219, 2223, —— L.Ed.2d —— (1999). Under the longstanding doctrine of *Ex Parte Young*, a private party can sue a state officer in his or her official capacity to enjoin prospective action that would violate federal law. 209 U.S. 123, 159–160, 28 S.Ct. 441,

52 L.Ed. 714 (1908). There, the Supreme Court held that suing Minnesota's Attorney General to prevent him from enforcing a law limiting railroad rates did not trench on the Eleventh Amendment because: "[t]he act to be enforced is alleged to be unconstitutional, and if it be so, the use of the name of the State to enforce an unconstitutional act to the injury of complainants is a proceeding without the authority of, and one which does not affect the state in, its sovereign or governmental capacity." *Id.; see also David B. v. McDonald*, 156 F.3d 780, 783 (7th Cir.1998) (*Young* treats state officials violating federal law "as renegades acting ultra vires," and thus those individuals may be enjoined without implicating state sovereignty or violating the Eleventh Amendment).

■ The Secretary does not argue that the plaintiff's assertion of federal jurisdiction under *Ex Parte Young* against him in his capacity as Wisconsin's Secretary of Agriculture, Trade and Consumer Protection is inappropriate, nor does he claim that the kind of relief that Dean Foods seeks is barred. *See Edelman v. Jordan*, 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974) (Eleventh Amendment generally prevents plaintiffs from claiming retroactive damages to be paid from state treasury). Instead, its claim seems to be based on *Pennhurst State School & Hosp. v. Halderman*, 465 U.S. 89, 106, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984), which held that federal courts cannot enjoin a state officer from violating state law. *Id.* at 121, 104 S.Ct. 900 ("a claim that state officials violated state law in carrying out their official responsibilities is a claim against the State that is protected by the Eleventh Amendment."). The Secretary's argument is that the district court's holding that a Wisconsin court would not interpret the regulations to reach Option Two sales "was purely a question of state law," and thus the decision was impermissible under *Pennhurst*.

■ This novel argument attempts to turn the district court's fealty to time-

honored rules of statutory interpretation into an Eleventh Amendment issue. Generally, courts interpret laws consistent with their meaning, but with an eye towards avoiding exposing any constitutional infirmities. Wisconsin courts do not depart from this well-established canon. *See State v. Zarnke*, 224 Wis.2d 116, 589 N.W.2d 370, 380 (Prosser, J., dissenting) (Wis.1999) ("It is the duty of this court . . . to so construe a statute as to find it in harmony with accepted constitutional principles.") (citing *State ex rel. Harvey v. Morgan*, 30 Wis.2d 1, 139 N.W.2d 585, 590 (1966)); *see also Wipperfurth v. U–Haul Co. of Western Wisconsin*, 101 Wis.2d 586, 304 N.W.2d 767, 779 (1981). More specifically, as we stated in *Morley–Murphy Co. v. Zenith Electronics Corp.*, a district court "must initially decide whether, as a matter of statutory construction, [a Wisconsin court] would interpret [a state law to apply to out-of-state transactions]. Only if the answer to this is yes would [this Court] have to reach the Constitutional question." 142 F.3d 373, 378 (7th Cir.1998). After all, given the rules of construction noted above, it would make little sense to read a law to regulate extraterritorial transactions "when the upshot is invalidity." *K–S Pharmacies, Inc. v. American Home Prods. Corp.*, 962 F.2d 728, 730 (7th Cir. 1992); *see also Morley–Murphy*, 142 F.3d at 379 ("state courts are no more in the habit of construing legislation in a way that would violate constitutional limitations than federal courts.").

Thus, the question at the heart of this jurisdictional matter is what is the source of the regulations' potential invalidity. If the district court used its interpretive methods to hold that a Wisconsin court would not find that the rules cover Option Two sales because their application violat-

ed some state law, then the Secretary's argument would be well-founded. Such a finding would violate *Pennhurst's* command that federal courts cannot enjoin state officers from violating state law. If, on the other hand, the reason the district court found that a Wisconsin court would demur from enforcing the rules against Option Two sales is rooted in federal law, then *Pennhurst* is inapposite. The answer to this is simple: as we discuss below in greater detail, extraterritorial regulation is barred by the federal constitution—a fact well known to Wisconsin courts. *See Morley–Murphy*, 142 F.3d at 379 (state courts are "well aware that the Supreme Court has held that certain assertions of extraterritorial jurisdiction violate the dormant Commerce Clause."). Thus, in order to avoid a holding that an application of the volume premium rules would violate the United States Constitution, the district court found that a Wisconsin court would not apply them to this factual scenario. To say, as the Secretary does, that the district court's holding does not enjoin him from violating any federal law, and that the injunction below makes no reference to a violation of the United States Constitution, is simply inaccurate. Accordingly, we find no Eleventh Amendment bar to this suit.

### B.

We must now address whether the district court's decision that a Wisconsin court would not enforce the volume pricing regulations against Option Two sales because of extraterritoriality concerns is correct.[3] The extraterritoriality principle is well established in Supreme Court precedent, dating at least to *Bonaparte v. Tax Court*, in which the Court held that "[n]o state can legislate except

3. The Secretary makes oblique reference to the possibility that the district court should have abstained from deciding this case under the authority of *Railroad Comm. of Tex. v. Pullman Co.*, 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941). However, this claim is not pressed in any meaningful way in the opening brief, and the Secretary does not return to it in his reply brief. Therefore, we decline to discuss the merits of the abstention argument. *See, e.g., United States v. Martinez*, 169 F.3d 1049, 1053 (7th Cir.1999) ("we need not address those arguments which are undeveloped.").

with reference to its own jurisdiction." 104 U.S. 592, 594, 26 L.Ed. 845 (1881). There is a long line of cases holding that states violate the Commerce Clause by regulating or controlling commerce occurring wholly outside their own borders. *See National Solid Wastes Mgmt. Ass'n v. Meyer*, 63 F.3d 652, 658 n. 8 (7th Cir.1995) (collecting cases). For example, in *Baldwin v. G.A.F. Seelig, Inc.*, the Supreme Court invalidated a provision of the New York Milk Control Act disallowing the sale of milk in New York that had been purchased outside of that state at a price below a set floor, holding that "New York has no power to project its legislation into Vermont by regulating the price to be paid in that state for milk acquired there." 294 U.S. 511, 521, 55 S.Ct. 497, 79 L.Ed. 1032 (1935).

Likewise, in *Edgar v. MITE Corp.*, a plurality of the Supreme Court struck down an Illinois law which required that certain corporate takeover offers be registered with the Illinois Secretary of State, and granted the Secretary of State the power to refuse registration to those offers he deemed insufficiently detailed. *See* 457 U.S. 624, 642–43, 102 S.Ct. 2629, 73 L.Ed.2d 269 (1982). Among the class of corporations which had to register offers were those organized under Illinois law, or having a certain portion of assets located in Illinois. *Id.* at 627, 102 S.Ct. 2629. Thus, the Illinois statute could apply to takeovers involving corporations whose shareholders were all residents of other states, meaning that, as written, the statute "could be applied to regulate [takeovers] which would not affect a single Illinois shareholder." *Id.* at 642, 102 S.Ct. 2629. The Court struck down the statute, noting that " 'any attempt to directly assert extraterritorial [power] over persons ... would offend sister States and exceed the inherent limits of the State's power.' " *Id.* at 643, 102 S.Ct. 2629 (citation omitted). Additionally, *Edgar v. MITE* held that extraterritorial legislation aimed at regulating commerce was precluded "whether or not the commerce has effects

within the [regulating] state." *Id.* at 642, 102 S.Ct. 2629; *see also Healy v. Beer Institute*, 491 U.S. 324, 336, 109 S.Ct. 2491, 105 L.Ed.2d 275 (1989); *In re Brand Name Prescription Drugs*, 123 F.3d 599, 613 (7th Cir.1997) (state cannot regulate sales that take place wholly outside it).

Before proceeding further, we note that the Secretary makes no attempt to rely on *CTS Corp. v. Dynamics Corp. of America*, a case in which the Supreme Court upheld an Indiana law which was similar to, albeit narrower than, the one at stake in *Edgar*. *See CTS*, 481 U.S. 69, 107 S.Ct. 1637, 95 L.Ed.2d 67 (1987). The relevant statute there regulated the purchase and sale of shares of stock in corporations chartered under Indiana law. *Id.* at 74, 107 S.Ct. 1637. It required that when a potential buyer wished to acquire control of voting shares in an Indiana corporation, approval was required by a majority of pre-existing shareholders regardless of whether the purchase or sale took place in Indiana. *Id.* Thus, the state law in *CTS* regulated potential purchases and sales of shares where the transaction would be wholly outside of Indiana. *Id.* The Court did not directly address *Edgar*'s seemingly total ban on extraterritorial legislation, even though the statute clearly could have that effect. Instead, it held that it would only strike down the statute if it "may adversely affect interstate commerce by subjecting activities to inconsistent regulations," because different states enacted conflicting regulatory schemes. 481 U.S. at 88, 107 S.Ct. 1637. There, no such threat existed, and the statute was upheld. *Id.*

*CTS* may be distinguishable from most other extraterritoriality cases because it dealt with corporations, which are uniquely creations of state law. *See* 481 U.S. at 93, 107 S.Ct. 1637 ("Indiana has a substantial interest in preventing the corporate form from becoming a shield for unfair business practices."); *see also* Donald H. Regan, *Siamese Essays: (I) CTS Corp. v. Dynamics Corp. of America and Dormant Com-*

*merce Clause Doctrine; (II) Extraterritorial State Legislation,* 85 MICH. L.REV. 1865, 1876–77 (1987) (*CTS* implies that "legal events which are transfers of ownership should be thought of as occurring wherever the corporation resides and has its internal affairs."). Additionally, while other cases have discussed the "inconsistent regulations" aspect of extraterritoriality, none have backed away from the long-established core principle that a statute or regulation that violates the extraterritoriality ban is per se invalid. *See Healy v. Beer Institute,* 491 U.S. 324, 336, 109 S.Ct. 2491, 105 L.Ed.2d 275 (1989) (holding that Commerce Clause precludes extraterritorial exercise of state power regardless of effects of commerce within legislating state, but also noting that "the practical effect of such a statute must be evaluated . . . by considering how the challenged statute may interact with the legitimate regulatory regimes of other states and what effect would arise if not one, but many or every, state adopted similar legislation."). Our cases have hewed to the per se rule, *see National Solid Wastes Mgmt. Ass'n v. Meyer,* 63 F.3d 652, 658 (7th Cir.1995) ("*NSWMA I*"); *see also National Solid Wastes Mgt. Ass'n v. Meyer,* 165 F.3d 1151, 1153 (7th Cir.1999) (per curiam) ("*NSWMA II*") ("No state has the authority to tell other polities what laws they must enact or how affairs must be conducted outside its borders.") (citations omitted). However, at least one has discussed the inconsistent regulations principle from *CTS. Morley–Murphy Co. v. Zenith Electronics Corp.,* 142 F.3d 373, 379 (7th Cir. 1998) (noting that "certain assertions of extraterritorial jurisdiction violate the dormant Commerce Clause," including those which "adversely affect interstate commerce by subjecting activities to inconsistent regulations.").

However, as we noted, the Secretary makes no mention of the "inconsistent regulations" strand of dormant Commerce Clause doctrine. Nor does the Secretary quarrel with the district court's and the appellee's assertion that Wisconsin may not, under any circumstances, regulate commerce occurring "wholly outside its borders." As the district court judge noted in her opinion below: "[a]ccording to the parties, the only matter that I must resolve is how Option Two transactions should be characterized. Defendant concedes that if Option Two transactions are commerce wholly outside the state, he may not regulate them." 22 F.Supp.2d 931, 938 (W.D.Wis.1998). On appeal, the Secretary has not challenged the scope of the district court's ruling, nor has he suggested that we broaden our analysis. Accordingly, we confine ourselves to determining whether Option Two sales were commerce occurring wholly outside Wisconsin.

### C.

■ The parties disagree about the appropriate amount of deference owed to the district court's ruling that the commerce at issue here took place wholly outside of Wisconsin. Appellee Dean Foods argues that this is a finding of fact, and that we should not disturb the ruling unless it is clearly erroneous. The Secretary argues, however, that our review should be de novo, pointing to a recent opinion from the Third Circuit which held that the question of whether commerce is "wholly outside" of a state is a legal question. *See A.S. Goldmen & Co. v. New Jersey Bureau of Securities,* 163 F.3d 780, 786 (3rd Cir.1999) ("[C]an it fairly be said that [the transaction at stake] occurs 'wholly outside' New Jersey? As this is a legal question, our review is plenary.") (citation omitted). Although our court generally applies a "light appellate touch . . . when the issue on appeal is whether the trial court . . . correctly applied a rule of law to the facts," we have recognized that where constitutional issues are at stake, more searching review may be needed. *United States v. Frederick,* 182 F.3d 496, 499 (7th Cir.1999); *see also Ornelas v. United States,* 517 U.S. 690, 696–97, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996). As was recently reiterated, " '[m]ost mixed ques-

tions of law and fact that require the application of constitutional principles to historical fact receive de novo review.'" *Frederick*, 182 F.3d at 503 (Diane Wood, J., concurring) (quoting *Coulter v. Gilmore*, 155 F.3d 912, 917 (7th Cir.1998); and citing *United States v. Raszkiewicz*, 169 F.3d 459, 462 (7th Cir.1999)). Dean Foods does not cite this standard, much less provide us with a reason for disregarding it. Thus we review the question of where the commerce at issue took place de novo.

In determining whether the Option Two plan involved commerce occurring "wholly outside" of Wisconsin, the district court focused heavily on where the sales between the appellee and Wisconsin farmers actually took place. Our prior case law lends some support to this methodology. We have held, for example, that extraterritoriality principles ban a state from regulating "sales that take place wholly outside it." *In re Brand Name Prescription Drugs*, 123 F.3d 599, 613 (7th Cir.1997). The Secretary argues that the emphasis on the sales alone too narrowly defines commerce. He urges us to look at the numerous contacts between Dean Foods and Wisconsin farmers and conclude that they are evidence that some of the commerce here occurs in Wisconsin. Although the appellant puts heavy emphasis on the number of contacts between the appellee and Wisconsin, we do not perceive him as arguing that substantial contacts with that state are sufficient to support a finding that some of the commerce occurred within its borders. Instead, we take him to mean that these contacts show that a contract was formed in Wisconsin. If the Secretary cannot make this showing, then the regulations will have the impermissible "effect of ... control[ling] conduct beyond the boundaries" of Wisconsin. *See Healy v. Beer Institute*, 491 U.S. 324, 336, 109 S.Ct. 2491, 105 L.Ed.2d 275 (1989).

■ Under the Uniform Commercial Code (adopted in both Wisconsin and Illinois, *see* William D. Hawkland, UNIFORM COMMERICAL CODE, § 1–101:01 (1995)), an enforceable contract for the sale of goods "may be made in any manner sufficient to show agreement including conduct by both parties which recognizes the existence of such a contract." U.C.C. § 2–204(1). We have held that for a valid contract to exist there must be an offer, "a valid acceptance of the offer... and evidence that the parties agreed on the essential terms and conditions of the contract." *Perritt Ltd. Partnership v. Kenosha Unified School Dist., No. 1*, 153 F.3d 489, 493 (7th Cir. 1998). No obligation exists between a buyer and seller of goods until both sides reach such an agreement. A buyer, such as Dean Foods, accepts goods and must pay for them only after the goods have been tendered, the buyer has had an opportunity to inspect them, and the buyer "signifies to the seller that the goods are conforming or that he will take or retain them in spite of their nonconformity," or if the buyer commits an act inconsistent with the seller's continued ownership. UCC § 2–606(1). Under the UCC, a sale occurs upon the passing of title to the goods from the buyer to the seller. *Id.* at § 2–106(1). Title passes from the seller to the buyer "at the time and place at which the seller completes his performance with reference to the physical delivery of the goods." *Id.* at § 2–401(2).

■ The formal purchase of goods may be preceded by background discussions of the terms of an agreement without producing a binding agreement on either party. Section 26 of the Restatement (Second) of Contracts speaks to these "preliminary negotiations," providing that: "[a] manifestation of willingness to enter into a bargain is not an offer if the person to whom it is addressed knows or has reason to know that the person making it does not intend to conclude a bargain until he has made a further manifestation of assent." Restatement (Second) of Contracts § 26 (1981). Furthermore, the commentary to § 26 implies that potential buyers and sellers with

ongoing relationships are well-positioned to know whether discussions are "preliminary negotiations," or something more definite. " 'Reason to know' depends not only on . . . words or other conduct, but also on the circumstances, including previous communications of the parties and the usages of their community or line of business." *Id.* at § 26 comment a.

With these standards in mind, we now examine the facts both sides have adduced about how Option Two works. Dean Foods presented testimony from its Director of Milk Procurement, William Cline, who testified that under Option Two, milk is purchased at one of the appellee's three northern Illinois dairy plants. Cline stated that milk was bought only after it was transported from Wisconsin to the Illinois dairy plants and a sample was taken from the load. He also averred that the timing of purchase was discussed with prospective sellers, and that they were expressly told that it was their responsibility to see that the milk was transported and delivered to one of the plants in Illinois. Mr. Cline also drew an important contrast between Option One sales and Option Two sales in an effort to bolster Dean Foods' contention that no commerce occurs in Wisconsin under the latter plan. Under Option One, because Dean Foods owns the milk as soon as it is picked up from the farmers, if commingled milk becomes contaminated, Dean Foods pays all of the producers for their good milk, and is reimbursed for that payment by the producer of the spoiled milk, or his insurance company. Option Two, however, provides that when commingled milk is contaminated by one producer, the offending producer is notified, and he is responsible for directly paying the other producers on that load for the fair market value for their good milk. Cline also specified that in the case of non-contaminated milk, no payment was made to dairy farmers until the product was accepted. Finally, Cline testified that while the appellee's field representatives could discuss Option Two with Wisconsin farmers, and grant them permission to bring their milk to Dean Foods' processing plants, field representatives and farmers both knew that the former had no authority to bind the appellee to purchase any milk under the Option Two plan.

Dean Foods offered additional testimony from one of its field representatives, Steven Cornelius, who reiterated that under Option Two (in contrast to Option One) the farmer is responsible for locating and negotiating terms with milk haulers, and the farmer maintains ownership of the milk until Dean Foods accepts it in Illinois. This was confirmed by five independent milk haulers, each of whom testified that per Option Two they contracted directly with the farmers to deliver milk to the appellee, and that the farmers own the milk until Dean Foods accepts it in Illinois. The haulers testified that the appellant took no part in these arrangements. A dairy farmer, George Crave, also testified that this was his understanding of his relationship with Dean Foods under Option Two. Crave offered testimony that he was under no continuing obligation to bring his milk to the appellee's plants for sale, and there were no formal steps he would be required to take to end his dealings with Dean Foods. Crave's testimony also makes clear that if he chose not to deliver milk to the appellee or if Dean Foods refused for any reason to accept his product, neither side had any legal recourse or remedy against the other.

The Secretary points to different "contacts" that the appellee has with the state of Wisconsin. Some of them, such as the fact that Dean Foods leases property in Wisconsin, has employees there, mails business solicitations to Wisconsin businesses and holds a certificate of authority from the Wisconsin Department of Financial Institutions authorizing it to do business as a foreign corporation in Wisconsin, do not appear relevant to our inquiry. Others, however, can be more plausibly considered salient. For example, Dean Foods' field representative, Steven Corne-

lius, testified that he would often solicit business from Wisconsin farmers, and would, when possible, "enroll" them in the Option Two program. "Enrollment" meant that the farmers would be entitled to deliver their milk to one of Dean Foods' three Illinois plants. Once a farmer enrolled in the Option Two program, no further discussions with Dean Foods needed to occur before the farmer began delivering milk to the appellee. Additionally, the appellant notes that the enrollment plan includes a provision that milk shipped and accepted by Dean Foods would be paid for at a pre-set rate, including volume premiums. The Secretary also presented evidence that farmers in Wisconsin would telephone Cline, Dean Foods' director of Milk Procurement, at his Illinois office to discuss the terms of the Option Two program. Other testimony the Secretary produces points to the expectation on the part of some of the dairy farmers that they would ship to Dean Foods every day, even though they were under no formal contractual agreement to do so.

Our view of these facts leads us to conclude that the sales indisputably occurred in Illinois, and that no contracts were formed in Wisconsin. No agreement or meeting of the minds, as is required by contract principles, occurred regarding the purchase of any shipment of milk until the product actually arrived in Illinois. Moreover, it was only at that point, when the necessary formalities of contract law had taken place, that title, possession and risk of loss passed. What the Secretary refers to as the contacts which he believes establish an ongoing contract between Dean Foods and Wisconsin farmers formed in Wisconsin are best categorized as "preliminary negotiations," a term which we defined above. The interactions Dean Foods had with Wisconsin farmers appear to us to be the paradigmatic example of the Restatement's rule that "a manifestation of willingness to enter into a bargain is not an offer if the person to whom it is addressed knows or has reason to know that the person making it does not intend to

conclude a bargain until he has made a further manifestation of assent." Our conclusion is buttressed by the fact that "reason to know" is to be understood with reference to the course of performance, and prior dealings between parties. Consider Dean Foods' "enrollment" of Wisconsin farmers into the Option Two plan before the farmers begin to deliver milk to the appellee's Illinois plants. As the record indicates, farmers, milk haulers, Dean Foods' field representatives, and officials at Dean Foods' plants in Illinois all understood exactly how Option Two worked, and, in particular, that no sales occurred, and no binding transactions entered into, until Dean Foods accepted the milk in Illinois. Thus, while the enrollment may have been an indication of Dean Foods' willingness to enter into a bargain with Wisconsin farmers, those farmers knew full well that enrollment by itself provided no guarantees. We also note that the "preliminary negotiations" rubric covers the announcement of Option Two rates. Such an announcement may be construed as a price quotation, which is "commonly understood as inviting an offer rather than making one, even when directed to a particular customer." Restatement (Second) of Contracts § 26, comment d (1981). This too would not create a binding commitment or contract between Dean Foods and Wisconsin farmers prior to the actual delivery and acceptance of milk in Illinois.

In sum, nothing the Secretary presents contradicts the basic fact that no binding commitment existed between Dean Foods and Option Two farmers before the milk is accepted in Illinois. In reaching this conclusion, we do not deny that Option Two sales have an effect that is felt, perhaps even predominantly, in Wisconsin. Such a statement would defy the reality that these sales involve Wisconsin farmers and Wisconsin milk. Nevertheless, as the legal rules we apply here make clear, the fact that a particular transaction may affect or impact a state does not license that state to regulate commerce which occurs

outside of its jurisdiction. *See, e.g., Healy v. Beer Institute*, 491 U.S. 324, 336, 109 S.Ct. 2491, 105 L.Ed.2d 275 (1989); *Edgar v. MITE*, 457 U.S. 624, 642, 102 S.Ct. 2629, 73 L.Ed.2d 269 (1982).

· Because we find that no commerce occurred in Wisconsin, the Secretary's reliance on *A.S. Goldmen & Co. v. New Jersey Bureau of Securities* is misplaced. *See* 163 F.3d 780 (3rd Cir.1999). That court observed:

> contracts formed between citizens in different states implicate the regulatory interests of both states. When an offer is made in one state and accepted in another, we now recognize that elements of the transaction have occurred in each state, and that both states have an interest in regulating the terms and performance of the contract.

*Id.* at 787. The Secretary's attempt to garner support from *Goldmen* is problematic, because that case is factually inapposite. There, an offer was made by a securities dealer in New Jersey and accepted by various individuals outside of New Jersey. *Id.* at 783. The contract for that sale was defined by the Third Circuit as occurring in both New Jersey and the buyer's home state. *Id.* at 787. That stands in marked contrast to the situation here, where we have held that the contract was created and performed wholly in Illinois. This is not a case where "elements of the transaction have occurred in each state." Thus, the Secretary's argument that *Goldmen* establishes that Wisconsin has a right to regulate Option Two sales leaves us unswayed.

Although we review the evidence de novo, we conclude that the district court was correct in finding that the commerce at issue here occurred wholly outside of Wisconsin, and thus any attempt by Wisconsin to enforce its volume premium rules against it would violate the extraterritoriality principle. Accordingly, we need not address the issue of whether the Wisconsin regulations constitute either direct or indirect discrimination against interstate commerce.

## Conclusion

For the reasons discussed above, the district court's ruling to grant injunctive relief to the plaintiff Dean Foods Company is AFFIRMED.