PUBLISHED

# UNITED STATES COURT OF APPEALS

## FOR THE FOURTH CIRCUIT

CAROLINA TRUCKS & EQUIPMENT,
INCORPORATED,
                    *Plaintiff-Appellee,*

v.                                          No. 06-1263

VOLVO TRUCKS OF NORTH AMERICA,
INCORPORATED,
                    *Defendant-Appellant.*

CAROLINA TRUCKS & EQUIPMENT,
INCORPORATED,
                    *Plaintiff-Appellant,*

v.                                          No. 06-1321

VOLVO TRUCKS OF NORTH AMERICA,
INCORPORATED,
                    *Defendant-Appellee.*

Appeals from the United States District Court
for the District of South Carolina, at Columbia.
Matthew J. Perry, Jr., Senior District Judge.
(3:02-cv-02605-MJP)

Argued: May 24, 2007

Decided: July 6, 2007

Before WILKINSON, MOTZ, and TRAXLER, Circuit Judges.

Affirmed in part, reversed in part, and remanded by published opinion. Judge Wilkinson wrote the opinion, in which Judge Motz and Judge Traxler joined.

**COUNSEL**

**ARGUED:** Clarence Davis, NELSON, MULLINS, RILEY & SCAR-BOROUGH, L.L.P., Columbia, South Carolina, for Appellant/Cross-Appellee. Marcus Angelo Manos, NEXSEN PRUET, Columbia, South Carolina, for Appellee/Cross-Appellant. **ON BRIEF:** William H. Latham, NELSON, MULLINS, RILEY & SCARBOROUGH, L.L.P., Columbia, South Carolina, for Appellant/Cross-Appellee. Manton M. Grier, Jr., NEXSEN PRUET, Columbia, South Carolina, for Appellee/Cross-Appellant.

---

**OPINION**

WILKINSON, Circuit Judge:

This case explores the extent to which a state has regulated — or may regulate — the auto dealer/manufacturer relationship beyond its own borders. The question is whether a South Carolina statute providing that a vehicle manufacturer generally "may not sell, directly or indirectly, a motor vehicle to a consumer in this State," except through its authorized franchises, forbade sales to South Carolina consumers by an out-of-state manufacturer that were consummated in Georgia. S.C. Code Ann. § 56-15-45(D) (2006). Plaintiff Carolina Trucks & Equipment, Inc. argues that the South Carolina law did forbid the Georgia sales. We disagree, and reverse the judgment in Carolina Trucks' favor, because the language of the South Carolina act will not support the broad extraterritorial scope that plaintiff would give to it. We also reject plaintiff's cross-appeal, and affirm the determination that Volvo did not breach its contract with Carolina Trucks.

I.

Plaintiff Carolina Trucks & Equipment, Inc. was a dealer of Volvo trucks in South Carolina from 1987 until November of 2002. Defendant Volvo Trucks of North America, Inc. ("Volvo") is a Delaware corporation that manufactures trucks and tractors. Its headquarters is in Greensboro, North Carolina.

A.

This appeal is from a judgment against Volvo under the South Carolina Regulation of Manufacturers, Distributors and Dealers Act ("Dealers Act"). It concerns the activities of Arrow Trucks, a used truck distributor that is a Volvo subsidiary. Arrow Trucks had no locations in South Carolina. However, Arrow had a branch in Atlanta, Georgia, which sold used trucks, including Volvo models.

Arrow's Atlanta location had some contacts within South Carolina. The company placed an advertisement for its Atlanta branch in the Columbia, South Carolina phone book. In addition, Arrow advertised in regional trade publications, at least one of which was sent into South Carolina. Carolina Trucks' principal Robert Beatty said that he received a brochure for Arrow Trucks with an industry monthly mailed to Beatty's South Carolina address. Beatty also testified without objection that some customers of Carolina Trucks told him that they had seen Arrow advertising.

From 1998 until 2002 — a period throughout which Carolina Trucks' profits from used truck sales fell — Arrow's Atlanta location sold seventy-eight trucks to consumers who listed residential addresses in South Carolina. Carolina Trucks presented evidence that fifty-four of those sales were to customers who resided in counties designated as Carolina Trucks' "exclusive" dealership area in the agreement between Carolina Trucks and Volvo.

Carolina Trucks does not allege that Arrow employees traveled to South Carolina to make these sales or that the sales were consummated at a location other than Arrow's Atlanta lot. In fact, Robert Beatty testified at trial that he had no evidence that any of Arrow's sales to South Carolina residents were made outside Atlanta. Carolina Trucks also presented no direct evidence that any of the South Carolina consumers who purchased trucks from Arrow saw the company's advertisement in the Columbia phone book or saw Arrow advertisements that were mailed into South Carolina. Nor did it present direct evidence that any consumers would have purchased trucks from plaintiff if they had not purchased them from Arrow in Atlanta.

B.

Carolina Trucks filed suit against Volvo on August 5, 2002 in the District of South Carolina, raising eleven claims under state and federal law. With the exception of one claim under the Dealers Act, the claims were either rejected as a matter of law by the district court, voluntarily dismissed, or rejected by the jury. The jury found in favor of Carolina Trucks, however, on plaintiff's claim that Volvo violated the provision of the Dealers Act prohibiting manufacturers from directly or indirectly selling motor vehicles to South Carolina customers except through a dealer licensed in South Carolina. It awarded a total of $583,245 in lost profits, statutory damages, and punitive damages to Carolina Trucks.

Volvo now challenges this verdict. It argues that South Carolina law did not apply to the sales by Arrow Trucks that formed the basis for the jury's verdict, because there was no evidence that those sales occurred within South Carolina. Volvo argues that as a result, the district court should have granted it judgment as a matter of law on this claim.

Carolina Trucks cross-appeals the disposition of two claims that were rejected by the jury: its claim of breach of contract and its claim of breach of contract accompanied by a fraudulent act. It argues that the district court should have entered judgment for it on the first claim, and ordered a new trial on the second.

We review *de novo* the denial of a motion for judgment as a matter of law. *In re Wildewood Litig.*, 52 F.3d 499, 502 (4th Cir. 1995). We examine "whether there is substantial evidence in the record" upon which the jury could find for the prevailing party, viewing the evidence in the light most favorable to that party. *Id.* We review the denial of a motion for a new trial for clear abuse of discretion. *Bristol Steel & Iron Works, Inc. v. Bethlehem Steel Corp.*, 41 F.3d 182, 186 (4th Cir. 1995).

II.

We turn first to Volvo's appeal of the judgment against it under South Carolina's Dealers Act. The Dealers Act limits competition

with local vehicle dealerships from both manufacturers and other dealers. *See* S.C. Code Ann. §§ 56-15-45. It provides that except under circumstances not relevant here, manufacturers may not themselves "own, operate, or control" a new motor vehicle dealer in South Carolina, *id.* § 56-15-45(A), and "may not sell, directly or indirectly, a motor vehicle to a consumer in this State, except through a new motor vehicle dealer holding a franchise for the line make that includes the motor vehicle," *id.* § 56-15-45(D).

Volvo argues as a matter of law that it did not violate this provision. It contends that while its Atlanta subsidiary, Arrow Trucks, sold vehicles to South Carolina consumers, there was no evidence that any of these sales took place in South Carolina, or at any location other than Arrow's Atlanta sales lot. Carolina Trucks does not dispute the state of the evidence, but argues that even if the South Carolina customers traveled to Atlanta to buy their vehicles, the resulting sales ran afoul of South Carolina law. It advances two theories to this effect. First, it argues that the Dealers Act should be read to prohibit sales to South Carolina residents regardless of where the sales occur. Second, it argues that the sales to South Carolina consumers occurred in part within South Carolina, and were forbidden by the state statute, because Arrow Trucks advertised in South Carolina. We take each theory in turn.

A.

Carolina Trucks first argues that Arrow's sales to South Carolina residents in Georgia were unlawful, because the Dealers Act prohibits manufacturer-to-consumer sales to South Carolina buyers without regard to the state in which the sales took place. Carolina Trucks argues that this is the best reading of statutory language providing that a manufacturer "may not sell, directly or indirectly, a motor vehicle to a consumer in this State" except through the franchises that manufacturers are generally prohibited from owning themselves. S.C. Code Ann. § 56-15-45(D). In particular, plaintiff claims, the modifier "in this State" must be taken to refer to the "consumer," not the entire sale that the statute proscribes. "In other words, the statute prohibits sales to South Carolina consumers."

We cannot agree that this result is compelled by the text. Carolina Trucks' broad reading is certainly not the only — and probably not

the best — interpretation of the statutory language. The statute is ambiguous as to what "in this State" modifies. Carolina Trucks observes that if the legislature had meant for "in this State" to refer to the entire sales transaction, it could have made this clearer by prohibiting, for example, "sales in South Carolina." But the legislature could also have spoken more clearly if it intended the statute to have the broader meaning Carolina Trucks advances, by prohibiting, for example, "sales to consumers who reside in South Carolina." That the statute does not specify whether "in this State" refers to the consumer or the transaction does not favor one reading over another.

We find it more revealing that even if "in this State" modifies "consumer," the most natural reading of the phrase would not reach sales outside South Carolina's borders. A "consumer *in* the State" is not the same as a "consumer *of* the State" or "consumer *from* the State." Once a South Carolinian travels to Georgia, he is no longer a "consumer *in* the State," and thus appears not to be a person to whom vehicle manufacturers are forbidden to make sales. At a minimum, nothing in the language of South Carolina's statute compels interpreting the state's law to forbid transactions in the other forty-nine states.

Since the text of the Dealers Act in no way compels Carolina Trucks' reading, we must not adopt it in light of South Carolina rules of statutory construction that forbid giving the state's laws extraterritorial reach. In construing a state law, we look to the rules of construction applied by the enacting state's highest court. *See Liberty Mut. Ins. Co. v. Triangle Indus., Inc.*, 957 F.2d 1153, 1156 (4th Cir. 1992). South Carolina rules of construction provide that statutes must not be read to operate outside the state's borders. The South Carolina Supreme Court has written repeatedly that South Carolina statutes "have no extraterritorial effect," *Ex Parte First Pa. Banking & Trust Co.*, 148 S.E.2d 373, 374 (S.C. 1966) (internal citation omitted); *see also Robertson v. Bumper Man Franchising Co., Inc.*, 612 S.E.2d 451, 452 (S.C. 2005), because "the general rule is that no state or nation can, by its laws, directly affect, bind, or operate upon property or persons beyond its territorial jurisdiction," *First Pa. Banking & Trust Co.*, 148 S.E.2d at 374 (internal citation omitted).

This rule is fatal to Carolina Trucks' reading of the Dealers Act. In assessing whether a statute is extraterritorial, "The critical inquiry

is whether the practical effect of the regulation is to control conduct beyond the boundaries of the State." *Healy v. Beer Inst.*, 491 U.S. 324, 336 (1989). Since reading South Carolina's statute to cover Arrow's sales in Georgia would interpret the statute to "control conduct" — sales — "beyond the boundaries of the State," *id.*, we find, contrary to Carolina Trucks' construction, that the Dealers Act forbids only manufacturer-to-consumer sales within South Carolina.

By reaching this holding as a matter of statutory construction, we avoid constitutional problems inherent in a broader interpretation of South Carolina law. The principle that state laws may not generally operate extraterritorially is one of constitutional magnitude. One state may not "project its legislation" into another, *Baldwin v. G.A.F. Seelig, Inc.*, 294 U.S. 511, 521 (1935), as the Commerce Clause "precludes the application of a state statute to commerce that takes place wholly outside of the State's borders, whether or not the commerce has effects within the State," *Healy*, 491 U.S. at 335 (quoting *Edgar v. MITE Corp.*, 457 U.S. 624, 642-43 (1982) (plurality opinion)); *see also Bigelow v. Virginia*, 421 U.S. 809, 822-23 (1975) ("The Virginia Legislature could not have regulated the advertiser's activity in New York, and obviously could not have proscribed the activity in that State.").

This rule reflects core principles of constitutional structure. It derives in part from the structure of federalism, which is built upon "the autonomy of the individual states within their respective spheres." *Healy*, 491 U.S. at 336; *see also Doctors Hosp. of Augusta, LLC v. CompTrust AGC Workers' Comp. Trust Fund*, 636 S.E.2d 862, 864 (S.C. 2006). It also reflects "the Constitution's special concern" with "the maintenance of a national economic union unfettered by state-imposed limitations on interstate commerce." *Healy*, 491 U.S. at 335-36. As the Supreme Court has indicated, extraterritorial laws disrupt our national economic union just as surely as "customs duties." *Seelig*, 294 U.S. at 521. The compliance costs that such laws impose undermine the Commerce Clause's objective of a "national common market." *See Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 350 (1977) (internal citation omitted). As a result, they jeopardize the benefits of a unified national market for the entrepreneur, who "shall be encouraged to produce by the certainty that he will have free access to every market in the Nation," and for the con-

sumer, who "may look to the free competition from every producing area in the Nation to protect him from exploitation by any." *H.P. Hood & Sons, Inc. v. Du Mond*, 336 U.S. 525, 539 (1949). That is the case here, where the plaintiff's view of South Carolina's statute would inhibit entrepreneurial activity nationwide and undermine the ability of South Carolina consumers to purchase trucks at competitive prices even outside the state's borders.

These costs should not be minimized, because one extraterritorial burden can easily lead to another. When one state reaches into another state's affairs or blocks its goods, "the door has been opened to rivalries and reprisals that were meant to be averted by subjecting commerce between the states to the power of the nation." *Id.* at 532 (internal citation omitted). South Carolina's framework of statutory construction gives voice to these structural interests as surely as our constitutional framework, and by interpreting the Dealers Act in accordance with the state's rule against extraterritorial applications, we avoid these constitutional harms.

B.

We turn next to Carolina Trucks' second argument. Plaintiff argues that South Carolina's rule that a manufacturer itself "may not sell, directly or indirectly, a motor vehicle to a consumer in this State," not only prohibited sales by Arrow to South Carolina customers on Georgia soil. Plaintiff claims additionally that since Arrow advertised within South Carolina, any "sales" to South Carolina residents should be presumed to have occurred in part within the state. S.C. Code Ann. § 56-15-45(D). It contends that "the sales took place partly on South Carolina soil" because "[a]lthough Arrow is physically located in Georgia, it entered South Carolina through direct mailings and phone-book advertisements." We reject this argument because plaintiff's creative definition of the location of a sale for purposes of the Dealers Act is just as problematic as plaintiff's first gloss on the statute: It would not necessarily avoid problems of extraterritoriality, and it threatens an obstruction of trade that may violate the dormant commerce clause and that invites First Amendment problems.

1.

First, there is every reason to conclude that a plaintiff cannot seek to apply one state's statute to transactions in another state through an

expansive definition of the site of the regulated conduct. The plaintiff would hold that if a vehicle manufacturer advertised in *Car & Driver* or *Motor Trend*, or operated a direct mailing list open to all subscribers, all fifty states might properly assert that the manufacturer made "sales" within their borders. Each state could thus seek to regulate the company's out-of-state conduct as connected to the sale without being held to regulate extraterritorially. This approach would take the commercial speech that is vital to interstate commerce and use it as a basis to allow the extraterritorial regulation that is destructive of such commerce.

The Supreme Court, however, has indicated that the rule against extraterritorial application of state law is not a technicality to be so readily evaded. It has deemed extraterritorial statutes that seize upon a company's in-state commercial activities, such as the mailings and phone book advertising in this case, to regulate the companies' out-of-state conduct, here the Georgia truck sales. For instance, the Court found extraterritorial a New York law requiring milk sellers to comply with a minimum-price schedule in purchasing milk from Vermont farmers that they later resold in New York. *Seelig*, 294 U.S. at 527. Since the pricing statute applied only to milk that would eventually be sold to New York consumers, it could be defined as a regulation of sales within New York. The statute was nonetheless deemed extraterritorial, however, because the police power may not "be used by the state of destination with the aim and effect of establishing an economic barrier against competition with the products of another state or the labor of its residents." *Id.* "What is ultimate," the Court wrote, "is the principle that one state may not place itself in a position of economic isolation." *Id.*

Similarly, the Supreme Court twice deemed state laws to be unconstitutional regulations of out-of-state conduct when they required alcohol distillers or distributors to post prices within the regulating state that were no higher than certain prices out-of-state. These statutes, too, could easily be framed as requirements for sales within the regulating state. *Healy*, 491 U.S. at 335-40; *Brown-Forman Distillers Corp. v. N.Y. State Liquor Auth.*, 476 U.S. 573, 583 (1986). But the Supreme Court refused to view them in those terms. That such a law "is addressed only to sales of liquor in" the regulating state "is irrelevant if the 'practical effect' of the law is to control liquor prices in

other States." *Id.* If a state could leverage contacts within its borders to control a company's conduct elsewhere without being held to regulate extraterritorially, this would be the national market's undoing. Indeed, it would impose "just the kind of competing and interlocking local economic regulation that the Commerce Clause was meant to preclude." *Healy*, 491 U.S. at 337.[1]

In light of these cases, we cannot accept Carolina Trucks' broad conception of the location of Arrow's sales. Arrow's advertising is an even more tenuous link between South Carolina and Arrow's sales in Atlanta than the links between the regulated transactions and the regulating state in *Seelig*, *Healy*, and *Brown-Forman*. This is particularly so because plaintiff proffered no direct evidence that Arrow's advertisements were even seen by any of the fifty-four residents of South Carolina who bought trucks from Arrow in Atlanta. Far better then to conclude that these sales took place where in fact they did take place: at Arrow's lot in Georgia. Concluding that Arrow's Atlanta sales occurred within South Carolina on the basis of such advertising contacts would transform the rule against extraterritoriality from a protection of commerce into a formality easily evaded. Companies would be faced with a Hobson's choice between complying with extraterritorial regulations of their out-of-state activities, and foregoing their participation in interstate trade due to the silencing of their speech. As the Court wrote in rejecting an analogous argument, "This would be to eat up the rule under the guise of an exception." *Seelig*, 294 U.S. at 523.[2]

---

[1]*Tousley v. North American Van Lines, Inc.*, relied on by Carolina Trucks, does not persuade us otherwise. That case indicated that South Carolina business laws could be applied to a transaction on the grounds that it occurred partially within the state's borders and partially elsewhere. The transaction at issue, however, could far more readily be classified as occurring within the state than the transaction at hand: The business arrangement giving rise to suit arose after the plaintiff saw the defendant's advertisement in a South Carolina newspaper, attended the defendant's seminar in the state, and finally made payment to the defendant in South Carolina. *See* 752 F.2d 96, 99, 103 (4th Cir. 1985).

[2]Our analysis in this matter parallels that of the Seventh Circuit in *Dean Foods Co. v. Brancel*, 187 F.3d 609 (7th Cir. 1999). Wisconsin sought to apply to an out-of-state milk processor a statute that prohibited

2.

Our view of the South Carolina Dealers Act avoids what would otherwise be serious constitutional difficulties. The Supreme Court has written that "there is no clear line" separating state laws that are "virtually *per se* invalid under the Commerce Clause," including those with forbidden extraterritorial reach, from the state laws that are invalid because they impermissibly burden interstate commerce under a balancing approach. *Brown-Forman*, 476 U.S. at 579. "In either situation the critical consideration is the overall effect of the statute on both local and interstate activity." *Id.*

Carolina Trucks' broad reading of "sale" in the Dealers Act is thus impermissible, whether our lens be one of extraterritorial effect, *see supra*, or one that balances under the dormant commerce power "whether the State's interest is legitimate and whether the burden on interstate commerce clearly exceeds the local benefits." *Brown-Forman*, 476 U.S. at 579 (citing *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970)).

A statute interpreted to ban advertising of out-of-state goods or services — on the theory that the advertisements led to otherwise lawful out-of-state sales — would pose grave problems under the most traditional Commerce Clause analysis. It is not clear that a state has any legitimate objective in suppressing speech within its borders that advertises these legal transactions outside the state. *Cf. Bigelow*, 421 U.S. at 827-28 (describing Virginia's "interest in shielding its citizens from information about activities outside Virginia's borders, activities that Virginia's police powers do not reach" as one that was "entitled to little, if any, weight under the circumstances"). Such restrictions

---

paying dairy producers volume-based premiums. *Id.* at 611-12. The Illinois milk processor purchased milk from Wisconsin dairy producers, and had field representatives in Wisconsin, but the producers were responsible for transporting their milk from Wisconsin to the processing plant in Illinois. *Id.* at 611, 619. The Seventh Circuit concluded that because "no contracts were formed in Wisconsin," and the contacts in the state amounted to "preliminary negotiations," Wisconsin could not prohibit the milk purchases at issue. *Id.* at 619.

could well be seen as seeking to prevent indirectly through gag orders the interstate commerce that states may not forbid directly. And because they would exert this preventative effect regardless of their purpose, the "burden upon interstate commerce" would be great. *Brown-Forman*, 476 U.S. at 579. Finally, the Supreme Court has made clear that the reading of South Carolina law proffered by Carolina Trucks would threaten First Amendment problems as well, holding on First Amendment grounds that a state "may not, under the guise of exercising internal police powers, bar a citizen of another State from disseminating information about an activity that is legal in that State." *Bigelow*, 421 U.S. at 824-25.[3]

We thus have no difficulty rejecting Carolina Trucks' reading of South Carolina law to regulate transactions by manufacturers anywhere in the country, so long as the manufacturer engaged in advertising within the state. Whether this view is regarded as infirm because it would read the statute to be extraterritorial or because it would read the statute to raise grave constitutional questions under the closely

---

[3]Avoidance of serious constitutional questions under the dormant commerce clause and First Amendment likewise bars an even broader reading of the Dealers Act than Carolina Trucks urges, as prohibiting vehicle manufacturers from advertising within South Carolina on the grounds that advertisements by themselves constitute sales. While the Dealers Act defines the term "sale" to include "any option, subscription or other contract, *or solicitation, looking to a sale*, or offer or attempt to sell in any form, whether spoken or written," S.C. Code Ann. § 56-15-10(l) (2006) (emphasis added), in order to avoid First Amendment and dormant commerce clause difficulties, "solicitation, looking to a sale" is best construed to refer to solicitations of the sales that would otherwise be illegal under the statute — sales within South Carolina — rather than the extraterritorial transactions that South Carolina may not directly regulate.

Nor can we find any substantive cause of action in the provision of South Carolina law which states that "[a]ny person" is "subject to the provisions" of the Dealers Act if the person "engages directly or indirectly in purposeful contacts within this State in connection with the offering or advertising for sale or has business dealings with respect to a motor vehicle within this State." S.C. Code Ann. § 56-15-20 (2006). This provision establishes that a defendant with sufficient South Carolina contacts is subject to the Dealers Act, but does not resolve what obligations the Act imposes with respect to out-of-state (or in-state) conduct.

related dormant commerce clause doctrines and under the First Amendment, respect for both state and constitutional law requires us to eschew plaintiff's view. South Carolina's law stating that manufacturers "may not sell, directly or indirectly, a motor vehicle to a consumer in this State, except through a new motor vehicle dealer holding a franchise for the line make that includes the motor vehicle," *id.* § 56-15-45(D), is best and naturally read to have no application to transactions in which South Carolina consumers travel outside the state to purchase trucks, and the fact that the out-of-state seller in this case engaged in commercial speech within South Carolina does not change this result.

## C.

Our interpretation of South Carolina law requires overturning the jury verdict in Carolina Trucks' favor. The only conduct by Arrow within South Carolina concerning which Carolina Trucks presented evidence was the company's advertisement in a South Carolina phone book and in a trade publication that was mailed into the state. There was no evidence, let alone "substantial evidence," *see Wildewood Litig.*, 52 F.3d at 502, that sales to South Carolina residents occurred anywhere other than Arrow's Atlanta dealership. Indeed, Carolina Trucks' principal Robert Beatty conceded as much on the stand. Volvo was therefore entitled to judgment as a matter of law that it did not violate South Carolina's provision that a vehicle manufacturer "may not sell, directly or indirectly, a motor vehicle to a consumer in this State," except through authorized franchises. S.C. Code Ann. § 56-15-45(D).

Volvo raises a variety of other challenges to the jury award against it under the Dealers Act. These include the question of whether the jury could override Carolina Trucks' contractual waiver of the damages in this case; the question of whether lost profits were proven with adequate certainty; and questions surrounding the basis for punitive and special damages. We need not address any of these questions because we conclude the appellee's argument falters at the first step.

## III.

Carolina Trucks challenges the verdict below on cross-appeal, arguing the district court should have granted it judgment as a matter

of law on its claim that Volvo breached its contract with the dealership. Under South Carolina law, a plaintiff claiming breach of contract has the burden "to prove the contract, its breach, and the damages caused by such breach." *Fuller v. E. Fire & Cas. Ins. Co.*, 124 S.E.2d 602, 610 (S.C. 1962). Plaintiff argues that there was no dispute that the parties had a contract stating that "so long as the Dealer complies with its obligations under this Agreement, the Company will not give any other *dealer* rights to locate a facility in the Dealer's Area of Responsibility" (emphasis added). Plaintiff further argues that Volvo violated this provision, because it was undisputed that Volvo allowed a franchise of Petro Stopping Centers to sell Volvo parts, repair Volvo trucks, and provide Volvo warranty services within Carolina Trucks' Area of Responsibility.

We think this claim was properly rejected. While the contract established that Volvo was generally forbidden to allow another Volvo "Dealer" to operate within Carolina Trucks' Area of Responsibility, it also made clear that Volvo was free to sell parts to other companies and to let those companies perform warranty service and other repairs. The agreement defined Carolina Trucks' Area of Responsibility as the region in which the company exercises "primary" — rather than exclusive — "sales, service, and customer support responsibilities." It also stated that Volvo reserved the right to sell "Products" within Carolina Trucks' Area of Responsibility, and defined "Products" to include "Parts," "Volvo Components," and "service products, including extended warranty, contract maintenance, financial offerings, customer support memberships, and other services provided from time to time." The agreement said that if Volvo "determines that it is appropriate in a particular case, it may sell Products directly to any purchaser regardless of where the purchaser is located or takes delivery."

The jury had ample basis to conclude that Volvo's arrangement with Petro comported with the contract. It could well have decided that the Petro franchise was not a "Dealer," because it did not sell new or used vehicles. The jury was free to conclude that the Petro franchise was instead merely a filling station that performed repair and service work as a secondary line of business. A member of Petro's board, Eddie Brailsford, gave evidence to support this conclusion, testifying that Petro locations sell neither new nor used trucks and that

he did not consider the truck stops to be "dealers." Since substantial evidence supported the jury's determination that Volvo did not breach its contract, we reject Carolina Trucks' cross-appeal on this claim. *See Wildewood Litig.*, 52 F.3d at 502.

This decision compels us to reject Carolina Trucks' second claim on cross-appeal, that it was entitled to a new trial on its claim of breach of contract accompanied by a fraudulent act. A claim for breach of contract accompanied by a fraudulent act requires that the plaintiff first establish a breach of contract. *Conner v. City of Forest Acres*, 560 S.E.2d 606, 612 (S.C. 2002). Since Volvo committed no breach of contract, plaintiff's claim of breach of contract accompanied by a fraudulent act fails at the outset.

## IV.

For the aforementioned reasons, the judgment of the district court is affirmed in part, reversed in part, and remanded with directions to enter judgment for defendant.

*AFFIRMED IN PART,*
*REVERSED IN PART,*
*AND REMANDED*